Brian Benestad (BBO No. 673787)
bbenestad@hkm.com
**HKM EMPLOYMENT ATTORNEYS LLP**
10 High Street, Suite 401
Boston, MA 02110
Telephone: 412-485-0133

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| DR. VRNDA BOYKIN, an individual,<br><br>Plaintiff,<br><br>v.<br><br>HUBSPOT, INC.,<br><br>Defendant. | Case No.: __________<br><br>COMPLAINT FOR DAMAGES<br><br>DEMAND FOR JURY TRIAL |

COMES NOW Plaintiff Dr. Vrnda Boykin ("Dr. Boykin"), by and through her counsel of record, and for causes of action and claims for relief against Defendant HubSpot, Inc. ("HubSpot" or "Defendant"), alleges as follows:

## I. NATURE OF THE ACTION

1. This case involves a sustained campaign of race discrimination, age discrimination, disability discrimination, and retaliation directed at Dr. Boykin, a Black woman over the age of 40, Despite a documented record of exceptional performance, two promotions carrying successive base-salary increases from $120,000 to $150,000 to $165,000, and quantifiable program outcomes benefitting the company, Dr. Boykin was subjected to a hostile

work environment under manager Annie Ingram, denied five internal advancement opportunities on the same day following protected complaints, and ultimately terminated effective June 2, 2025, the exact date of her scheduled major back surgery, while on approved, paid FMLA leave and with her benefits simultaneously eliminated. HubSpot's conduct violated Title VII of the Civil Rights Act of 1964, the Age Discrimination in Employment Act, the Americans with Disabilities Act, the Family and Medical Leave Act, 42 U.S.C. § 1981, and the Massachusetts Fair Employment Practices Act, G.L. c. 151B.during her four-and-a-half-year tenure at HubSpot, Inc., where she served successively as Manager, Customer Training Team and as a Senior Program Manager

2. Dr. Boykin has satisfied all required administrative prerequisites before filing this lawsuit.

## II. PARTIES

3. Plaintiff Dr. Vrnda Boykin is an individual residing in Mesa, Arizona.

4. Defendant HubSpot, Inc. is a corporation with its principal place of business at 2Canal Park, Cambridge, Massachusetts 02141. HubSpot employed 8,246 full-time employees as of December 31, 2024 and 8,882 as of December 31, 2025, according to its annual reports filed with the Securities and Exchange Commission, and is registered as a Foreign Profit Corporation with the Massachusetts Secretary of the Commonwealth. At all relevant times, HubSpot was an "employer" within the meaning of Title VII, the ADEA, the ADA, the FMLA, and G.L. c. 151B. Although Dr. Boykin performed her work remotely from Arizona, the core of her employment relationship was in Massachusetts. HubSpot's headquarters, human resources function, and Employee Relations investigative function are located in Cambridge, Massachusetts. HubSpot's internal records designate the job locations for Dr. Boykin's positions as Cambridge,

Massachusetts, including the Manager, Customer Training Team role for which she was hired and the Sales Skills Training Program Manager role for which she applied in 2025. The decisions to deny Dr. Boykin advancement, to investigate her, and to terminate her employment were made by or through HubSpot personnel and processes based in Massachusetts, and her separation agreement was issued from HubSpot's Massachusetts offices.

## III. JURISDICTION AND VENUE

5. This Court has subject matter jurisdiction over this dispute under federal question. The claims in this action arise under the laws of the United States, including Title VII of the Civil Rights Act of 1964; the Age Discrimination in Employment Act of 1967; the Americans with Disabilities Act of 1990; the Family and Medical Leave Act, ; and 42 U.S.C. § 1981.29 U.S.C. §§ 2601, et seq., 42 U.S.C. § 12101, et seq., 29 U.S.C. § 621 et seq., 42 U.S.C. § 2000e, et seq.2, 8 U.S.C. § 1331.

6. Venue is proper in this District under 28 U.S.C. § 1391(b)(1) and (b)(2) because a substantial part of the events and omissions giving rise to this complaint occurred within the District of Massachusetts, where HubSpot maintains its principal place of business.

7. Supplemental jurisdiction over Plaintiff's state law claims is proper pursuant to 28 U.S.C. § 1367 because those claims arise from the same nucleus of operative facts as the federal claims.

## IV. ADMINISTRATIVE EXHAUSTION

8. Dr. Boykin timely filed a Charge of Discrimination against HubSpot with the United States Equal Employment Opportunity Commission ("EEOC"), assigned Charge No. 540-2025-05837, alleging discrimination based on race, age, and disability, and retaliation.

9. Dr. Boykin's Charge of Discrimination was dual-filed with the Massachusetts Commission Against Discrimination ("MCAD"), assigned MCAD Docket No. 25BEM01731.

10. On May 29, 2026, the EEOC issued Dr. Boykin a Notice of Right to Sue. Dr. Boykin received the Notice of Right to Sue thereafter, and this lawsuit is filed within ninety days of that receipt. No Notice of Right to Sue is required to maintain her claim under the Age Discrimination in Employment Act; more than sixty days elapsed between the filing of her Charge and the commencement of this action. See 29 U.S.C. § 626(d)(1).

11. Dr. Boykin has satisfied all administrative prerequisites to filing suit under Title VII, the ADEA, the ADA, and G.L. c. 151B.

12. With respect to her claims under G.L. c. 151B, Dr. Boykin filed her complaint with the MCAD within three hundred days of the alleged unlawful practices, more than ninety days have elapsed since that filing, and this action is commenced within three years after the alleged unlawful practices occurred. Dr. Boykin will notify the MCAD of the filing of this civil action as required by G.L. c. 151B, § 9.

13. Dr. Boykin's claims arising under Title VII, the ADEA, the ADA, and G.L. c. 151B are timely as to each discrete act of discrimination and retaliation occurring within three hundred days before the filing of her Charge of Discrimination. Dr. Boykin further alleges that the conduct described below constitutes a single continuing hostile work environment, at least one act contributing to which occurred within the charge-filing period. Allegations concerning conduct occurring before that period are pleaded as background evidence in support of her timely claims and as independently actionable conduct under 42 U.S.C. § 1981, which carries a four-year limitations period.

///

## V. FACTUAL ALLEGATIONS

**HubSpot, Inc. - Company Background**

14. Defendant HubSpot, Inc. ("HubSpot") is a major technology company providing customer relationship management ("CRM"), marketing, sales, and customer service software solutions. HubSpot employs approximately 8,000 people and operates as a publicly traded software-as-a-service ("SaaS") company. HubSpot has publicly promoted itself as a company committed to diversity, inclusion, and belonging, maintaining policies against discrimination and retaliation and operating employee resource groups ("ERGs") specifically designed to support employees from underrepresented backgrounds.

**Dr. Vrnda Boykin - Qualifications and Background**

15. Plaintiff Dr. Vrnda "Dr. V" Boykin is a Black woman born on November 29, 1973. At all times relevant to this action, Dr. Boykin was over the age of 40. She holds a Bachelor of Science in Marketing Management, a Master of Science in Management and Leadership, a Master of Business Administration, and a Doctor of Business Administration in Organizational Leadership from National University, which she completed in 2024 while employed at HubSpot. Additionally, Dr. Boykin is Certified Associate in Project Management from the Project Management Institute, a certification she received prior to working at HubSpot, which was an important resume element during the hiring process.

16. Dr. Boykin is a highly accomplished and extensively credentialed learning and development professional with years of experience in sales training, program management, and organizational enablement. Prior to joining HubSpot, she served as a Sales Training Manager at Groupon for over three years, building and managing more than ten scalable training programs for onboarding, continuing education, and management support. She increased department

satisfaction scores by over 45%, coached trainers, managers, and sales representatives. Additionally, Dr. Boykin developed an entire sales process for the organization. Before Groupon, she served as a Sales Training Manager at Amobee, where she led go-to-market program delivery and supported the organization's diversity and inclusion mission.

17. Dr. Boykin is also an accomplished author and public speaker. For three consecutive years, she was a featured speaker at HubSpot's annual INBOUND conference, one of the most prominent marketing and sales conferences in the world, drawing tens of thousands of attendees. Her professional reputation, expertise, and credibility were well established within and beyond HubSpot at the time of her termination.

**HubSpot Hire and Early Career Excellence**

18. On December 7, 2020, HubSpot hired Dr. Boykin as Manager, Customer Training Team, reporting to Moe Bachouti, at an annual base salary of $120,000. In this role, Dr. Boykin reimagined, defined, and executed a successful new revenue stream for HubSpot's professional services customer training program, achieving over 107% attainment within 75 days of launch. She implemented cross-team collaboration frameworks, developed new program solutions, and transformed team performance through effective change management leadership.

19. Dr. Boykin's early performance at HubSpot was exceptional. For the first half of 2021, her manager at that time, Wakisha "Kisha" Morris, who succeeded Moe Bachouti, rated her performance a 4 - "Often Exceeds Expectations" on HubSpot's five-point scale, while Dr. Boykin's self-evaluation reflected a 5 - "Consistently Exceeds Expectations." For the second half of 2021, both manager and employee evaluations reflected a 5 - "Consistently Exceeds Expectations" - the highest rating available on HubSpot's scale.

20. Consistent with her outstanding performance, HubSpot recognized Dr. Boykin with a promotion effective June 13, 2022. In a letter dated May 6, 2022, HubSpot offered Dr. Boykin the role of Senior Program Manager, Global Skills, in the Go-To-Market Enablement ("GTME") organization, reporting to Christopher Prudente, at an annual base salary of $150,000. At the time of this internal mobility, Dr. Boykin was a Black woman then 48 years old, moving from a people manager position to an individual contributor Senior Program Manager role within the GTME team.

**Program Delivery Excellence and a Pattern of Recognition**

21. In her new role, Dr. Boykin delivered extraordinary results. She scoped, developed, and launched the first-ever performance support program created by the GTME team for Sales and Customer Success Representatives. The Thrive 1.0 program produced measurable results: an 11% lift in deal creation, a 2% lift in close rate, and a 6% improvement in quota attainment for program participants. Thrive 2.0 results were similarly compelling, with an 8% delta in deal creation and a 6% improvement in average sales price for participants who completed more than 50% of the program - compared to a 6% drop for those who completed less. Dr. Boykin also developed the BOOST program for the Customer Success organization, resulting in a 10% improvement in attainment, and collaborated to operationalize a full-scope training program for Business Development Representatives.

**A New Manager and the Emergence of a Hostile Environment**

22. In February 2023, Dr. Boykin was assigned a new manager: Annie Ingram, who had just returned from a leave of absence and was unfamiliar with Dr. Boykin's workload, work product, and ongoing projects. On February 13, 2023, Dr. Boykin was informed of this management change by Morgan Jacobson. Almost immediately, Dr. Boykin observed a pattern

of conduct from her new manager and from senior director Morgan Jacobson that left her isolated, unsupported, and subjected to a disproportionate and undefined workload.

23. Throughout April 2023, Dr. Boykin was managing four global programs simultaneously - a workload that no other similarly situated program manager carried. On April 4, 2023, during a GTME program review meeting, Dr. Boykin's professional authority as Senior Program Manager was openly undermined. When Enablement Partner Joe Bourke questioned her expert content decisions - including the standard duration for e-learning modules - Annie Ingram acknowledged the issue via Slack during the meeting but offered Dr. Boykin no support. Instead, Ingram counseled Dr. Boykin on her tone after the meeting, telling her the interaction "fell flat" and "seemed a little down."

24. On April 6, 2023, Dr. Boykin received the Thrive 2.0 program results, which demonstrated statistically significant positive outcomes for participants. When she shared these results with Annie Ingram and Morgan Jacobson, Ingram responded only with a red heart emoji. There was no acknowledgment of the program's success, no celebration with the team, and no verbal or written recognition. Morgan Jacobson responded, "in line with thrive 1.0 but take the win," but again offered no announcement or formal recognition. When Dr. Boykin achieved comparable results with Thrive 1.0, under manager Sacha Dekker, her results were celebrated in a team meeting, then she was asked to present to HubSpot's most senior leadership, including CEO Yamini Rangan. The results were not meaningfully acknowledged until Dr. Boykin raised them herself at a Global Sales Manager meeting on April 19, 2023. This absence of recognition contributed to what Dr. Boykin described as "role and success ambiguity" - she remained uncertain what success looked like in her role despite delivering measurable, quantifiable outcomes.

25. On April 11 and April 12, 2023, Dr. Boykin again raised concerns about the lack of clear role boundaries - specifically the need for defined “swimlanes” between Program Managers, Enablement Partners, and Instructional Designers - and requested that content review cycles stop so the team could focus on the administrative work required to launch four global programs. Both times, the men on the team - Joe Bourke and Morgan Jacobson - disregarded Dr. Boykin’s requests and authority. Annie Ingram remained silent, offering no support for Dr. Boykin’s position as Senior Program Manager. On April 12, while facing an unmanageable workload, Ingram added to it by asking Dr. Boykin to help guide her colleague, Rebecca Wolf, who had significantly fewer programs to manage, on how to roll out a mandatory compliance program.

26. On April 13, 2023, Dr. Boykin was informed she would be assigned a newly contracted instructional designer starting April 24. She had previously requested that a seasoned designer already in place be assigned instead. Morgan Jacobson told her she was “the only one who could actually ‘handle it’” - placing even more responsibility on Dr. Boykin while denying her request.

27. On April 17, 2023, Dr. Boykin met with Morgan Jacobson and explicitly asked him why her authority as Program Manager was not being respected. She asked why her clear directions had been ignored on two separate occasions, and why she was being told by Joe Bourke what content would appear in programs she herself had designed and managed. Jacobson told Dr. Boykin she should have spoken up more directly - specifically, that she should have told him to “knock it the fuck off and listen to me.” When Dr. Boykin pointed out that Annie Ingram had just counseled her to adopt a softer, lighter tone, Jacobson stated that those directives were incompatible. He also told Dr. Boykin that the quantifiable results her programs had delivered

were "minimal" and "didn't even matter." Dr. Boykin later described feeling "shocked" and confused about what success in her role was supposed to look like, given that her documented program outcomes were being openly minimized.

**Emergency Room Visit and First FMLA Leave**

28. On April 20, 2023, Dr. Boykin sought care at an emergency room for work-related exhaustion. The relentless pressure of managing four global programs without adequate support, in part due to company-wide force reduction, combined with ongoing role ambiguity and a management team that disregarded her authority and minimized her results, had taken a serious physical and emotional toll.

29. On April 24, 2023, Dr. Boykin sent an email to HubSpot's Human Resources department requesting to meet with her HR Business Partner about her emergency room visit on April 20 for work-related exhaustion. Later that same day, she shared her concerns directly with Annie Ingram. When Dr. Boykin stated that she had received emergency room care and was not ready to discuss it, Ingram pressed her for information six times. Dr. Boykin consistently corrected Ingram's characterization that she was "angry," stating repeatedly that she was not angry but was asking for support, clarity, and an equitable workload. In response, Ingram told Dr. Boykin she needed to "take more ownership" of her programs and stated, "I can see that you are angry" - reducing Dr. Boykin's legitimate concerns to an emotional reaction. When Dr. Boykin raised her disproportionate and undefined workload in detail, noting that she had taken on four global program launches while creating all content in a single quarter during a force reduction, Ingram responded that Dr. Boykin was "meeting expectations." Dr. Boykin replied that she had not taken on that volume of work in order to merely "meet expectations."

30. On April 24, 2023, Dr. Boykin submitted a formal written complaint to HubSpot requesting an administrative remedy, stating: "I am asking for an administrative remedy at the HubSpot level." In her complaint, she documented the pattern of unsupported friction, role ambiguity, and unacknowledged contributions she had experienced. HubSpot acknowledged receipt of the complaint on April 27, 2023.

31. Beginning April 27, 2023, Dr. Boykin took an approved leave of absence. What began as an FMLA approved stress leave became a caregiver leave within two days, when Dr. Boykin's mother underwent triple bypass surgery. Dr. Boykin cared for her mother during a period of critical medical need. HubSpot's records reflect that Dr. Boykin's personal illness leave covered April 27 through May 27, 2023, a period that overlapped with protected FMLA caregiver leave.

**HR Mediation and Inadequate Response**

32. On June 12, 2023, HubSpot arranged a mediation meeting involving Dr. Boykin, Annie Ingram, and HR Business Partner Jessica Alvarez. The stated goal of the meeting was to "clear the air, reset expectations," and establish a path forward. During the meeting, HR acknowledged that there was "misalignment and lack of clarity" in Dr. Boykin's role. Annie Ingram acknowledged that Dr. Boykin had not been "set up for success" by the program structure she had inherited from her predecessor. The mediation meeting produced a plan of action that included recalibration meetings, reconnecting with key stakeholders, and clarifying the scope of Dr. Boykin's programs.

33. At no point in this mediation, or in any HR communication that followed, did HubSpot impose any consequence on the managers and directors whose conduct had driven Dr. Boykin to the emergency room. The pattern of unsupported friction with male colleagues, the

dismissal of Dr. Boykin's professional authority, the minimization of her documented program outcomes, and the unequal distribution of work were never formally addressed. HubSpot's response was, in substance, to ask Dr. Boykin and Annie Ingram to work it out together.

34. Later on June 12, 2023, Dr. Boykin reached out via Slack to Al Smith, who had by then become her prospective new manager, with a communication that alluded to Dr. Boykin's concerns that she might need to drop her HR complaint against Annie Ingram as a condition of being allowed to transfer teams. Smith confirmed that she would have to drop the complaint, advice that Dr. Boykin followed, withdrawing her complaint via email.

**A Successful Transfer and Another Promotion**

35. While working through the mediation process with Annie Ingram, Dr. Boykin pursued an internal interview process for the role of Manager, GTME Leadership Enablement, reporting to Al Smith. She proceeded through multiple rounds of interviews in June and July 2023. The interview feedback she received was overwhelmingly positive: one interviewer wrote, "Loved V! She is clearly very excited about this role and has articulated her relevant experience across Groupon and HubSpot very well. Would highly recommend her for this role." In the earlier 2022 interview process that led to her Global Skills role, an interviewer had written that Dr. Boykin was "a perfect fit for this role," combining "past experience in learning program development, a passion for learning, and role expertise that would up-level the GTME team and the whole Sales floor." Yet another stated: "V is a very strong program manager and brings a lot of expertise to the intersection of L&D and Sales ... We saw her do this with Thrive and Boost. These were massive programs at global scale. She brought the ropes down to the ground on both of these, very quickly. This is most definitely V's superpower."

36. On July 19, 2023, HubSpot offered Dr. Boykin the position of Senior Program Manager - GTME Leadership Enablement, reporting to Al Smith, at an annual base salary of $165,000. Dr. Boykin assumed the new role effective August 1, 2023. This was her second internal promotion in approximately thirteen months - each promotion accompanied by documented excellence, measurable program outcomes, and strong peer and leadership endorsements.

37. Dr. Boykin's performance reviews under Al Smith were consistent with her earlier record. For the second half of 2023, Smith rated her performance a 3 - "Meets Expectations" - and noted that she had "successfully met the expectations of her role," had "executed the biggest change to the Team Lead program in HubSpot's history," and that he was "excited to see the value she creates for HubSpot in 2024." Dr. Boykin's self-evaluation for that period was a 4 - "Often Exceeds Expectations" - noting that her programs had generated quantifiable cost savings exceeding half a million dollars for the company.

**A Pattern of Racial Disparities in Promotion and Separation**

38. During her tenure at HubSpot, Dr. Boykin began observing a disturbing and consistent pattern: white women on her team were repeatedly placed into leadership roles - including Team Lead positions and internal mobility roles - without any formal interview process, while she and her colleagues of color were required to formally apply and interview for every opportunity. This pattern was not isolated. Dr. Boykin became aware of multiple BIPOC employees who had either been separated from the organization or passed over for advancement under Annie Ingram's leadership, including Lucas Pinto (Black and Hispanic male), Evelyn Lawrence (Black female), Al Smith (Black male), Johnny Cruz (Black and Hispanic male), and Porsche Golden (Black female). By contrast, white colleagues were regularly elevated without

competitive processes. For example, two white female colleagues, Rebecca Wolf and Tara Kirwan, were permitted to transfer positions within the same team without being required to interview - a privilege not extended to Dr. Boykin when she sought similar opportunities.

39. On March 14, 2024, Annie Ingram was promoted to Vice President of Enablement. This meant that Dr. Boykin - who had filed a formal HR complaint against Ingram in 2023 - was now once again, along with Al Smith, reporting through Ingram's chain of command. This restructuring placed the same executive who had been the subject of Dr. Boykin's protected complaint in a position of direct authority over her career, performance ratings, advancement, and income potential.

40. On March 20, 2024, Dr. Boykin moderated HubSpot's Women's History Month virtual event featuring investor and entrepreneur Arlan Hamilton. During the interview, Hamilton asked Dr. Boykin to share her background. After several attempts by Dr. Boykin to redirect the conversation, she complied. This directly contributed to the event being the highest-attended and most-watched event organized by HubSpot's culture team during that period. Despite this success, the Vice President of Culture sent internal communications criticizing Dr. Boykin's moderation, characterizing the conversation as "a little off the rails" and suggesting the topic was not "relevant to all women," while also commenting that the speaker should not be "talking about the 'I' and the 'me' all the time." Following those dismissive statements, Dr. Boykin was not invited to moderate or conduct any further events for that organization.

41. On April 16, 2024, Annie Ingram fired Al Smith - who had been the only Black director on the team. Dr. Boykin later noted that with Smith's departure, she lost the one leader within the GTME organization who had been a buffer between her and Annie Ingram's direct authority. Following Smith's exit, Dr. Boykin's new interim manager, Cody Normond, told her

during their first one-on-one meeting on April 18, 2024, that she was "being underutilized and we may ask you to flex to maximize your impact." Normond left HubSpot in June of 2024, leaving Dr. Boykin reporting directly to Annie Ingram.

**Dr. Boykin's Protected Activities and Escalating Discrimination Reporting**

42. On or about October 22, 2024, Dr. Boykin reported on HubSpot's internal Employee Net Promoter Survey ("eNPS") that she had concerns about unfair promotion practices within the organization. On October 29, 2024, Dr. Boykin had a direct conversation with Annie Ingram and Dr. Boykin's Team Lead, Brailee Black, in which she raised concerns about the disproportionately high number of BIPOC employees who had been separated from the team and the exclusion of BIPOC employees from leadership advancement opportunities. Dr. Boykin named specific employees: Lucas Pinto, Evelyn Lawrence, Al Smith, April Terry, Porsche Golden, and Johnny Cruz, all of whom were Black or Hispanic, and all of whom had been separated from the team. Annie Ingram attributed each departure to performance issues. Dr. Boykin pointed out that it appeared that BIPOC employees were being disproportionately identified as underperformers. Ingram assured Dr. Boykin that it was safe to raise these concerns.

43. On November 19, 2024, during an Employee Resource Group leadership team meeting - where Dr. Boykin served as a member of leadership in HubSpot's People of Color ERG - Dr. Boykin was made aware of internal HubSpot reporting compiled by the HR team that showed statistically significant attrition numbers and low employee sentiment among BIPOC employees at HubSpot.

44. On December 9, 2024, Dr. Boykin participated in a fact-finding panel led by Leslie Forde, an externally hired professional engaged by HubSpot to investigate why BIPOC employees were leaving the company at disproportionate rates and why BIPOC employee

sentiment was low. Dr. Boykin provided Leslie Forde with a compilation of promotion and separation concerns specific to the team led by Annie Ingram. On information and belief, Leslie Forde thereafter delivered a report containing findings from the December 2024 sessions.

45. On January 17, 2025, Dr. Boykin met with Ben Putterman, HubSpot's Vice President of Learning and Talent Development, who was responsible for equity within HubSpot. Dr. Boykin shared her concerns about the team's promotion practices and about her own treatment, including Annie Ingram's repeated statements that Dr. Boykin "was not set up for success in her role." Putterman responded, "What the fuck does that even mean?" - reflecting his own confusion about the vague and shifting standards being applied to Dr. Boykin. When Putterman indicated he would speak with Annie Ingram about Dr. Boykin's concerns, Dr. Boykin expressed fear directly: "I hope I still have a job after you speak with her." Putterman replied, "So do I." His response was not reassuring. It was a candid acknowledgment that raising internal equity concerns at HubSpot carried genuine risk of retaliation.

**A New Manager Arrives with a Predetermined Agenda**

46. On January 7, 2025, Joe Deegan was hired as Dr. Boykin's new direct manager. Deegan's first week was spent in onboarding, and he went on vacation the following week. Dr. Boykin and Deegan had their first one-on-one meeting on January 15, 2025.

47. On February 4, 2025, Ben Putterman met with Joe Deegan. That same day, Deegan and Dr. Boykin held a "Role Activation Brainstorm" meeting with Brailee Black - only the second time Deegan and Dr. Boykin had formally met since his arrival. The tone of that meeting, Dr. Boykin later noted, was distinctly different from every interaction she had with Deegan afterward.

48. Immediately following the Role Activation Brainstorm on February 4, 2025, Dr. Boykin had a skip-level meeting with Annie Ingram. For the first time in her four-and-a-half-year career at HubSpot, Dr. Boykin was told that she had not met performance standards - specifically, that she had not met H2 2024 expectations. This was the first time Dr. Boykin had received this feedback. It had not appeared in any written communication, had not been raised in any prior meeting, and was not reflected in the formal performance review she had received for the same period. When Dr. Boykin began writing notes during the meeting in response to this unexpected information, Ingram demanded in a sharply accusatory tone: “I see you documenting. Is there something you want to say?” Dr. Boykin replied: “This is the first time I am hearing I didn’t meet expectations. Of course, I am writing this down. I am shocked.”

49. On February 4, 2025, following the meeting with Ingram, Dr. Boykin sent a detailed email response to Ingram and Joe Deegan, noting: “It was tough to hear that you feel I did not meet role expectations in 2024. Thank you for confirming that we are not on a timeline towards a PIP. This is the first time I have heard I am not meeting role expectations.” In her email, Dr. Boykin documented multiple specific steps she had taken to advance her programs and meet every stated expectation, including meeting regularly with L&D team members, refining the Leadership Onboarding content, and incorporating new program content. She also noted: “I did not receive messaging from my Team Lead that I was not performing to expectations.”

50. Ingram replied on February 6, 2025, characterizing the February 4 conversation as “feedback” rather than a formal performance review. Three weeks later, on February 26, 2025, Dr. Boykin received her official H2 2024 performance review - and was rated a 3, “Meets Expectations.” This directly contradicted what Ingram had told her verbally on February 4. The

written review issued by Annie Ingram confirmed that Dr. Boykin met expectations, while the verbal communication three weeks earlier had characterized her as not meeting them.

**Retaliation Begins: The Retaliatory Investigation**

51. On February 5, 2025, Employee Relations investigator Craig Belinfanti reached out to Dr. Boykin because her new manager, Joe Deegan - who had managed her for less than one month and had only had one one-on-one meeting with her - had reported to HR that Dr. Boykin “had concerns.” Dr. Boykin had not raised her equity and promotion concerns with Deegan in either of their two prior meetings. She had raised those concerns with Ben Putterman. The fact that Employee Relations was contacting her one day after Putterman met with Deegan - and following Ingram’s statement that Boykin had a “narrative” that Ingram was out to get her - led Dr. Boykin to reasonably conclude that the information she shared with Putterman had been transmitted to Deegan and was now being used to investigate her rather than address her concerns.

52. On February 6, 2025, just two days after Dr. Boykin shared her equity concerns with Putterman and after Deegan’s conversation with Putterman, Joe Deegan sent Dr. Boykin an email setting new role performance expectations. Deegan stated: “you’ve allowed ambiguity to get in the way of meeting expectations,” and proceeded to impose aggressive new deliverable deadlines, mandate extensive documentation, and subject Dr. Boykin to persistent critical feedback and micro-management. Deegan had been Dr. Boykin’s manager for less than one month, had been absent for vacation during his second week, and had not yet observed or reviewed any of Dr. Boykin’s ongoing programs.

53. The micro-management and caustic feedback Dr. Boykin received from Deegan throughout February and March 2025 stood in stark contrast to how she described his initial

approach in their first substantive meeting on February 4. As Dr. Boykin noted during the Employee Relations investigation: “My meeting on February 4 with role activation brainstorm ... had a different tone than all of my subsequent meetings with Joe Deegan.” His approach toward Dr. Boykin was, in Dr. Boykin’s words: “He’s treating me like Annie reported it, which is, I did not meet expectations, and I require heavy-handed management and heavy-handed feedback.”

54. On February 21, 2025, Craig Belinfanti informed Dr. Boykin that the Employee Relations investigation into her complaint of unfair promotion practices had been closed with a finding of no policy violation. Belinfanti stated that HubSpot was “unable to substantiate” her concerns. At no point during this process did HubSpot investigate the cumulative pattern of racially disparate promotions and separations that Dr. Boykin had documented. In the same period, Belinfanti asked Dr. Boykin: “Have you considered you just aren’t good at your job?” That question - posed to a woman with a doctorate, three promotions or internal advances, and years of documented outstanding performance - echoes daily in Dr. Boykin’s mind and has eroded her professional confidence.

**The February 26 Ambush**

55. On February 26, 2025, Dr. Boykin received her official H2 2024 performance review, reflecting a rating of 3 - “Meets Expectations.” Immediately after receiving that review, she met with Annie Ingram, Joe Deegan, and Brailee Black to present her Leadership Onboarding strategy and vision. What followed was, in Dr. Boykin’s words, unlike anything she had experienced in her four-and-a-half years at HubSpot: “I have never in my tenure at HubSpot been in a situation where I was given feedback at the same time by three people senior to me. The feedback was highly critical and demeaning, and I was interrupted several times.” The

meeting was both bewildering and humiliating - she had just received a rating of “Meets Expectations” but was being treated as a significantly underperforming employee.

56. The feedback session on February 26 also created what Dr. Boykin described as a “double bind”: Joe Deegan told her she needed to identify the skills required for the program and build her plan around how long it would take to deliver those skills. When Dr. Boykin built her program for a five-month timeline based on that guidance, her Team Lead, Brailee Black, directed her to reduce it to 30 days. When Dr. Boykin sought to clarify the contradiction, Deegan said she needed to get that information from stakeholders at the Vice President and Director level. But Dr. Boykin’s presentation to the SteerCo - the meeting where that senior alignment would occur - had been postponed indefinitely by Deegan himself. He was her gatekeeper for the very information he claimed she was failing to obtain.

57. On March 3, 2025, Joe Deegan responded to Dr. Boykin’s request for clarity on H1 2025 performance benchmarks by stating: “I’d love for you to focus your energy on what’s going to move your program forward rather than challenges that other Program Managers may or may not have.” His dismissal of Dr. Boykin’s workload concerns was notable given what the record shows: Dr. Boykin was managing four programs simultaneously - the Leadership Onboarding program, the Team Lead program, the CoachHub program, and the Buddy Program - while similarly situated white program managers each managed a single program and had dedicated Project Manager support. As Dr. Boykin documented on March 14, 2025, Maddy Clark (white female, Program Manager) had one program with a Project Manager; Sam Bialosky (Program Manager) had one program; Judith Hart (Principal Program Manager) was working on her programs with the assistance of the Team Lead, Brailee Black; Tara Kirwan (Principal Program Manager) had one program with Project Manager support; and Mark Baskin (Senior

Program Manager) had one program with Project Manager support and was receiving direct support from Joe Deegan himself as a co-Program Manager.

58. On March 17, 2025, Joe Deegan sent Dr. Boykin an email stating: "this is another weekly update where I was disappointed to not see an update from you. Remember I also flagged this in last month's update on Feb 11." Dr. Boykin immediately responded with a screenshot demonstrating that she had submitted updates for all four of her programs on March 7. Deegan's entire response was "whoops" - without an apology for his tone or for the false accusation. Deegan's eagerness to assign fault without first verifying the facts reflected the pattern of bad-faith scrutiny to which Dr. Boykin had been subjected since she reported her discrimination concerns.

**Five Internal Applications Rejected, All on the Same Day**

59. Beginning in late February 2025, Dr. Boykin applied for multiple internal positions at HubSpot, seeking either a lateral transfer or a promotion. On February 28, 2025, she applied for the role of Manager, GTME Global Programs, which was a direct report position under Joe Deegan. When she informed Deegan of her application, he did not raise any concerns and indicated she should expect to hear from the recruiter. On March 2, 2025, she applied for the Senior Manager, GTME - Customer Success role, having been encouraged to apply by a former manager from the Customer Success team who believed it would be an excellent fit.

60. Dr. Boykin proceeded through multiple rounds of interviews for the Manager, GTME Global Programs role. Her interview performance was described by some reviewers as polished and experience-rich, with positive recognition of her executive presence, stakeholder management, and GTME expertise. But on March 14, 2025, in a conversation lasting less than two minutes, Joe Deegan informed Dr. Boykin that she had not been selected. He told her: "I

decided to go with Maddy for the manager role." The "Maddy" in question - Maddy Clark - was a white woman who had been appointed to the Team Lead role without ever applying or interviewing for it. Deegan explained that Clark "has been Team Lead leading the team as it is today and really established herself as an expert program manager," and stated that he was "concerned about what we are seeing today and improving the program management of leadership onboarding today before we go give you more responsibility." In other words, HubSpot's stated justification for denying Dr. Boykin the promotion was that she needed to improve the very program that Deegan himself was blocking her from presenting to SteerCo and for which he was withholding stakeholder alignment.

61. The manner in which Maddy Clark obtained the role that was awarded to her confirms the discriminatory pattern Dr. Boykin had observed for years: a white colleague received a leadership position through appointment, without a job posting, without a competitive process, and without an interview. Dr. Boykin - a Black woman with four years of documented performance, three consecutive promotions or advances, and extensive program management experience, and certification - was required to apply, interview through multiple rounds, and was ultimately rejected in favor of a less-qualified person who had been quietly installed without competition.

62. On March 15, 2025, Dr. Boykin received formal notification that she had not been selected for the Senior Manager, GTME - Customer Success role. On March 19, 2025, Senior Recruiter Cathy Byrne - after hearing the explanation for Dr. Boykin's rejection - asked a pointed question: why had Dr. Boykin been cleared to interview for the Manager role if there were concerns about her performance? Byrne noted that Deegan had cleared Dr. Boykin as a candidate rather than flagging any performance concerns to the recruiting team.

**A Retaliatory Counter-Investigation Targeting Dr. Boykin**

63. On March 24, 2025, Dr. Boykin had formally submitted a written request to reopen the Employee Relations investigation into retaliation, stating: "The treatment I have received since reporting my concerns suggests that I am experiencing retaliatory actions aimed at silencing my voice and undermining my professional contributions." She documented the pattern: caustic and aggressive communications; unwarranted scrutiny of her work; simultaneous multi-person critical feedback sessions in which she was repeatedly demeaned and interrupted; a less than 2 minute rejection call premised on concerns that arose only after she reported her equity concerns; and a direct statement from her manager that he "would take time to formulate additional criticisms" of her work. No meaningful remediation followed. On March 27, 2025, Employee Relations investigator Leigh Dixon contacted Dr. Boykin in connection with a complaint that had been filed against her. Dixon informed Dr. Boykin that "a colleague" had raised concerns about "potential unprofessional behavior." The investigation into Dr. Boykin - launched weeks after she had filed a formal retaliation complaint and while her own discrimination complaint remained unresolved - had every hallmark of a retaliatory counter-investigation designed to discredit and intimidate her.

64. On the same day, March 27, 2025, Employee Relations also conducted a separate investigation into Dr. Boykin's retaliation complaint. During that investigation, Dr. Boykin described in detail the cascade of adverse treatment she had experienced since reporting her concerns: the first-ever negative verbal performance discussion followed by a contradictory written "Meets Expectations" review; the less than two minute call in which she was denied advancement; the simultaneous three-person feedback sessions in which she was demeaned and

repeatedly interrupted; the false accusation that she had not submitted weekly updates; and the withholding of resources available to every other program manager on her team.

65. On March 31, 2025, all five of Dr. Boykin's open job applications were rejected on the same day. In addition to the two roles noted above, she was rejected for: Senior Manager, HubSpot Academy Education; Global Program Manager, Management and Leadership Development; and Sales Skills Training Program Manager. The simultaneous rejection of five separate job applications on a single day, following Dr. Boykin's formal discrimination complaints, constitutes a pattern that no reasonable observer could view as coincidental.

**FMLA Leave, Disability, and a Disability-Based Adverse Employment Environment**

66. Dr. Boykin suffers from lumbar spondylosis and related spinal conditions, including cervical spondylosis, sacroiliitis, bilateral lumbar radiculopathy, and complex regional pain syndrome. These conditions, which are documented extensively in her medical records from Arizona Pain and multiple surgery centers, required ongoing treatment beginning at least as early as 2024 and continuing through and after her termination. The conditions caused pain, loss of function, restricted range of motion, and stiffness that significantly impacted Dr. Boykin's ability to perform activities of daily living and her job functions.

67. Beginning in early 2025, Dr. Boykin's treating provider, pain management specialist Katharine Wilson, FNP-C, completed an FMLA certification reflecting that Dr. Boykin's condition started around December 31, 2024, was expected to last approximately six months, and required multiple treatments. HubSpot approved Dr. Boykin for continuous FMLA leave from March 27, 2025 through the end of June 2025, and the certification reflected that she was incapacitated from March 27, 2025 onward, and that the condition rendered her unable to

perform essential job functions including sitting at a computer, typing, reading, and critical thinking.

68. Throughout the period between February and May 2025 - even as Dr. Boykin was managing her health condition and undergoing medical procedures - she continued to work diligently, submit program updates on time, respond to feedback within 24 to 48 hours, and produce substantive work products. Dr. Boykin underwent procedures for lumbar spondylosis at SanTan Surgery Center on March 7, 2025, a complicated double eye surgery on May 12, 2025, a second procedure for lumbar spondylosis on May 16, 2025, and a lumbar radiofrequency ablation procedure on May 23, 2025. Throughout this period, she remained on approved FMLA leave.

69. On May 28, 2025, while Dr. Boykin was on approved FMLA leave and receiving short-term disability benefits recovering from her medical procedures, a HubSpot People Team representative named Jackie McSweeney called Dr. Boykin's personal cell phone. It was the second attempt to reach her. The voicemail stated: "Hi V, this is Jackie McSweeney. I'm calling from the people team at HubSpot ... we have some changes related to the team ... we have not been able to get in touch with you." The communication did not disclose that Dr. Boykin's position was being eliminated. Dr. Boykin later described this call as part of what left her "shocked and blindsided."

**Termination on the Day of Surgery**

70. Dr. Boykin's employment with HubSpot was terminated effective June 2, 2025. HubSpot claimed the termination was part of a restructuring. June 2, 2025, was the date of Dr. Boykin's scheduled Anterior Lumbar Interbody Fusion, a major back surgery requiring multiple days of hospitalization. Dr. Boykin's approved FMLA leave and supporting medical

documentation reflected an expected incapacity period extending through the end of June 2025. HubSpot terminated Dr. Boykin on the exact date she had scheduled surgery and simultaneously terminated the benefits she had been receiving as an employee. She was required to go into surgery without a job. As Dr. Boykin later described: "I had to use a walker for weeks - trying to interview while recovering from major surgery is wrong."

71. The timing of Dr. Boykin's termination was not accidental. HubSpot had been in possession of Dr. Boykin's FMLA paperwork reflecting her expected recovery timeline. The termination effective date coincided with her major eye and back surgeries. Her benefits expired simultaneously, leaving her without employment or benefits extending to support her recovery.

72. Additionally, Dr. Boykin had been publicly announced as a featured speaker at HubSpot's INBOUND conference for that same year, a platform she had occupied for three consecutive years. Dr. Boykin's invitation to present at INBOUND was rescinded, citing that she was no longer employed by HubSpot. However, on information and belief, other former HubSpot employees, including individuals then working for HubSpot partners, were invited and permitted to present. The exclusion was humiliating and publicly visible to her professional network.

73. HubSpot's characterization of the termination as a restructuring is contradicted by available evidence. On information and belief, the tasks Dr. Boykin had been performing were redistributed to other employees rather than eliminated. Of the four Senior Program Managers in the decisional unit, only Dr. Boykin and one other were selected for termination, while the two Senior Program Managers who were retained were substantially younger than Dr. Boykin. HubSpot's own disclosure under the Older Workers Benefit Protection Act, provided with Dr. Boykin's proposed separation agreement, identifies the ages and job titles of every employee in

the decisional unit, which HubSpot defined as all United States-based members of the GTM Enablement function. That disclosure reflects that of the eight employees in the decisional unit who were forty years of age or older, two were selected for termination, while of the approximately twenty-five employees under the age of forty, two were selected. Dr. Boykin, then fifty-one, was among those selected; the two Senior Program Managers retained in her title were thirty-six and thirty-seven years old.

## VI. CLAIMS FOR RELIEF

### FIRST CAUSE OF ACTION:

### Race Discrimination - Disparate Treatment in Violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq.

74. Dr. Boykin realleges and incorporates by reference all preceding paragraphs of this Complaint as if fully set forth herein.

75. Title VII makes it unlawful for an employer to discharge or otherwise discriminate against any individual with respect to the terms, conditions, or privileges of employment because of the individual's race. To establish a claim of disparate treatment, Dr. Boykin must show that she is a member of a protected class, that she was qualified for and performing her job, that she suffered an adverse employment action, and that the action occurred under circumstances giving rise to an inference of race discrimination, including more favorable treatment of similarly situated employees outside her protected class.

76. Dr. Boykin is a Black woman and a member of a protected class under Title VII.

77. Dr. Boykin was qualified for and satisfactorily performing her positions at HubSpot. She held a doctorate and a project management certification, delivered measurable program results, earned three successive promotions or internal advances, and received performance ratings of "Meets Expectations" or higher throughout her tenure.

78. Dr. Boykin suffered adverse employment actions, including the denial of promotions and lateral transfers, the simultaneous rejection of five internal job applications on March 31, 2025, and the termination of her employment effective June 2, 2025.

79. These adverse actions occurred under circumstances giving rise to an inference of race discrimination. White colleagues, including Maddy Clark, Rebecca Wolf, and Tara Kirwan, were placed into leadership and transfer roles through appointment, without any competitive application or interview process, while Dr. Boykin and other BIPOC employees were required to apply and interview for every opportunity. Maddy Clark, a white woman who had been installed as Team Lead without applying or interviewing, was selected over Dr. Boykin for the Manager, GTME Global Programs role. Multiple BIPOC employees were separated or passed over under Annie Ingram's leadership, while non-Black program managers retained their positions when Dr. Boykin was terminated.

80. HubSpot's stated reasons for its adverse actions were pretextual, as demonstrated by the contradiction between Dr. Boykin's documented performance record and the shifting, unsubstantiated performance criticisms leveled against her after she raised concerns about racial disparities.

81. As a direct and proximate result of HubSpot's unlawful conduct, Dr. Boykin has incurred and continues to incur economic losses in an amount to be proven at trial.

82. As a direct and proximate result of HubSpot's unlawful conduct, Dr. Boykin has suffered and will continue to suffer mental stress, humiliation, inconvenience, and loss of enjoyment of life, all constituting non-economic loss in an amount to be determined at trial.

83. HubSpot's conduct was undertaken with malice or with reckless indifference to Dr. Boykin's federally protected rights, entitling her to punitive damages.

WHEREFORE, Dr. Boykin prays for judgment against HubSpot on this cause of action for back pay and front pay and lost benefits, compensatory damages for emotional distress, punitive damages, reasonable attorneys' fees and costs, pre- and post-judgment interest, injunctive and equitable relief, and such other relief as the Court deems just and equitable.

**SECOND CAUSE OF ACTION:**

**Race-Based Hostile Work Environment in Violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq.**

84. Dr. Boykin realleges and incorporates by reference all preceding paragraphs of this Complaint as if fully set forth herein.

85. Title VII prohibits an employer from subjecting an employee to a hostile work environment because of the employee's race. To establish this claim, Dr. Boykin must show that she was subjected to unwelcome conduct because of her race, that the conduct was sufficiently severe or pervasive to alter the conditions of her employment and create an abusive working environment, and that a basis exists for imputing liability to the employer.

86. Dr. Boykin, a Black woman, was subjected to unwelcome conduct because of her race, including the persistent undermining of her professional authority, the minimization of her documented program outcomes, the assignment of a disproportionate and undefined workload not carried by white colleagues, the withholding of Project Manager support routinely provided to white program managers, simultaneous multi-person critical feedback sessions in which she was demeaned and interrupted, the demeaning suggestion that she was "just not good at her job," and the denial of advancement opportunities routinely extended to white colleagues without competition.

87. This conduct was severe or pervasive. It persisted over the course of Dr. Boykin's tenure, escalated after she reported concerns about racial disparities, and was sufficiently

continuous and concerted to alter the terms and conditions of her employment and create a work environment that a reasonable person would find hostile and abusive. Dr. Boykin subjectively perceived the environment to be hostile and abusive, as reflected by her emergency room visit for work-related exhaustion and her documented emotional harm.

88. A basis exists for imputing liability to HubSpot because the conduct was committed by Dr. Boykin's supervisors and managers, including Annie Ingram, Morgan Jacobson, and Joe Deegan, and because HubSpot failed to take effective remedial action despite Dr. Boykin's repeated complaints.

89. As a direct and proximate result of HubSpot's unlawful conduct, Dr. Boykin has incurred and continues to incur economic losses in an amount to be proven at trial.

90. As a direct and proximate result of HubSpot's unlawful conduct, Dr. Boykin has suffered and will continue to suffer mental stress, humiliation, inconvenience, and loss of enjoyment of life, all constituting non-economic loss in an amount to be determined at trial.

91. HubSpot's conduct was undertaken with malice or with reckless indifference to Dr. Boykin's federally protected rights, entitling her to punitive damages.

WHEREFORE, Dr. Boykin prays for judgment against HubSpot on this cause of action for back pay and front pay and lost benefits, compensatory damages for emotional distress, punitive damages, reasonable attorneys' fees and costs, pre- and post-judgment interest, injunctive and equitable relief, and such other relief as the Court deems just and equitable.

**THIRD CAUSE OF ACTION:**

**Retaliation in Violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e-3**

92. Dr. Boykin realleges and incorporates by reference all preceding paragraphs of this Complaint as if fully set forth herein.

93. Title VII prohibits an employer from retaliating against an employee because the employee has opposed a practice made unlawful by Title VII or participated in a protected proceeding. To establish this claim, Dr. Boykin must show that she engaged in protected activity, that she suffered a materially adverse action, and that a causal connection exists between the protected activity and the adverse action.

94. Dr. Boykin engaged in protected activity by reporting concerns about unfair and racially disparate promotion practices on HubSpot's internal eNPS survey; by raising concerns directly with Annie Ingram and Brailee Black on October 29, 2024; by raising concerns with Ben Putterman on January 17, 2025; by participating in the company-sponsored fact-finding panel led by Leslie Forde; and by submitting formal complaints and requests to reopen the retaliation investigation, including on March 24, 2025.

95. Dr. Boykin suffered materially adverse actions, including heightened and bad-faith scrutiny of her work, the imposition of aggressive new performance expectations, demeaning multi-person feedback sessions, a retaliatory counter-investigation into her own conduct, the denial of five internal job applications rejected on the same day, and the termination of her employment.

96. A causal connection exists between Dr. Boykin's protected activity and the adverse actions, as demonstrated by the close temporal proximity between her complaints and the adverse actions, including that Employee Relations contacted her one day after Putterman met with Deegan, that Deegan imposed new performance expectations two days after she raised equity concerns with Putterman, and that the retaliatory counter-investigation was launched weeks after her formal retaliation complaint. The post-termination confirmation from Al Smith

that Ingram "was pissed" Dr. Boykin had opened an HR case against her further establishes retaliatory motive.

97. As a direct and proximate result of HubSpot's unlawful conduct, Dr. Boykin has incurred and continues to incur economic losses in an amount to be proven at trial.

98. As a direct and proximate result of HubSpot's unlawful conduct, Dr. Boykin has suffered and will continue to suffer mental stress, humiliation, inconvenience, and loss of enjoyment of life, all constituting non-economic loss in an amount to be determined at trial.

99. HubSpot's conduct was undertaken with malice or with reckless indifference to Dr. Boykin's federally protected rights, entitling her to punitive damages.

WHEREFORE, Dr. Boykin prays for judgment against HubSpot on this cause of action for back pay and front pay and lost benefits, compensatory damages for emotional distress, punitive damages, reasonable attorneys' fees and costs, pre- and post-judgment interest, injunctive and equitable relief, and such other relief as the Court deems just and equitable.

## FOURTH CAUSE OF ACTION:

### Race Discrimination and Retaliation in the Making and Enforcement of Contracts in Violation of 42 U.S.C. § 1981

100. Dr. Boykin realleges and incorporates by reference all preceding paragraphs of this Complaint as if fully set forth herein.

101. Section 1981 guarantees all persons the same right to make and enforce contracts, including the making, performance, modification, and termination of contracts and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship, without regard to race. Section 1981 prohibits both intentional race discrimination and retaliation in the employment relationship.

102. Dr. Boykin, a Black woman, had a contractual employment relationship with HubSpot.

103. HubSpot intentionally discriminated against Dr. Boykin on the basis of race in the terms, conditions, benefits, privileges, and termination of her employment contract, including by subjecting her to a disproportionate workload, denying her promotions and transfers extended to white colleagues without competition, and terminating her employment while retaining non-Black program managers.

104. HubSpot also retaliated against Dr. Boykin because she opposed race discrimination, subjecting her to heightened scrutiny, a retaliatory counter-investigation, the denial of advancement, and termination.

105. Race was a but-for cause of the adverse contractual actions taken against Dr. Boykin.

106. As a direct and proximate result of HubSpot's unlawful conduct, Dr. Boykin has incurred and continues to incur economic losses in an amount to be proven at trial.

107. As a direct and proximate result of HubSpot's unlawful conduct, Dr. Boykin has suffered and will continue to suffer mental stress, humiliation, inconvenience, and loss of enjoyment of life, all constituting non-economic loss in an amount to be determined at trial.

108. HubSpot's conduct was willful, malicious, and undertaken with reckless indifference to Dr. Boykin's protected rights, entitling her to punitive damages.

WHEREFORE, Dr. Boykin prays for judgment against HubSpot on this cause of action for back pay and front pay and lost benefits, compensatory damages for emotional distress, punitive damages, reasonable attorneys' fees and costs, pre- and post-judgment interest, injunctive and equitable relief, and such other relief as the Court deems just and equitable.

**FIFTH CAUSE OF ACTION:**

**Age Discrimination in Violation of the Age Discrimination in Employment Act, 29 U.S.C. § 621 et seq.**

109. Dr. Boykin realleges and incorporates by reference all preceding paragraphs of this Complaint as if fully set forth herein.

110. The ADEA makes it unlawful for an employer to discharge or otherwise discriminate against any individual who is at least 40 years of age with respect to the terms, conditions, or privileges of employment because of the individual's age. To establish this claim, Dr. Boykin must show that she was at least 40 years old, that she was qualified for her position, that she suffered an adverse employment action, and that age was the but-for cause of the adverse action, including by showing more favorable treatment of substantially younger employees.

111. At all relevant times, Dr. Boykin was over the age of 40 and within the class protected by the ADEA.

112. Dr. Boykin was qualified for and satisfactorily performing her positions at HubSpot.

113. Dr. Boykin suffered adverse employment actions, including the denial of promotions and transfers, the simultaneous rejection of five internal job applications, and the termination of her employment.

114. Substantially younger employees were treated more favorably, including being placed into leadership and transfer roles without a competitive process and being retained when Dr. Boykin was terminated. Age was a but-for cause of the adverse actions taken against Dr. Boykin.

115. As a direct and proximate result of HubSpot's unlawful conduct, Dr. Boykin has incurred and continues to incur economic losses in an amount to be proven at trial.

116. As a direct and proximate result of HubSpot's unlawful conduct, Dr. Boykin has suffered and will continue to suffer harm. HubSpot's violation of the ADEA was willful, entitling Dr. Boykin to liquidated damages.

WHEREFORE, Dr. Boykin prays for judgment against HubSpot on this cause of action for back pay and front pay and lost benefits, liquidated damages, reasonable attorneys' fees and costs, pre- and post-judgment interest, injunctive and equitable relief, and such other relief as the Court deems just and equitable.

**SIXTH CAUSE OF ACTION:**

**Disability Discrimination - Disparate Treatment in Violation of the Americans with Disabilities Act, 42 U.S.C. § 12101 et seq.**

117. Dr. Boykin realleges and incorporates by reference all preceding paragraphs of this Complaint as if fully set forth herein.

118. The ADA prohibits an employer from discriminating against a qualified individual on the basis of disability with respect to the terms, conditions, and privileges of employment. To establish this claim, Dr. Boykin must show that she has a disability, that she is a qualified individual able to perform the essential functions of her job with or without reasonable accommodation, and that she suffered an adverse employment action because of her disability.

119. Dr. Boykin has a disability within the meaning of the ADA. She suffers from lumbar spondylosis and related spinal conditions, including cervical spondylosis, sacroiliitis, bilateral lumbar radiculopathy, and complex regional pain syndrome, which substantially limit major life activities including walking, sitting, standing, and the operation of musculoskeletal and neurological functions. In the alternative, HubSpot regarded Dr. Boykin as disabled.

120. Dr. Boykin was a qualified individual who could perform the essential functions of her position with or without reasonable accommodation. She continued to submit program updates, respond to feedback, and produce substantive work products throughout her treatment.

121. HubSpot took adverse employment action against Dr. Boykin because of her disability, including terminating her employment effective June 2, 2025, the exact date of her scheduled major back surgery, while she was on approved FMLA leave and while HubSpot possessed her medical documentation reflecting her disability and recovery timeline.

122. As a direct and proximate result of HubSpot's unlawful conduct, Dr. Boykin has incurred and continues to incur economic losses in an amount to be proven at trial.

123. As a direct and proximate result of HubSpot's unlawful conduct, Dr. Boykin has suffered and will continue to suffer mental stress, humiliation, inconvenience, and loss of enjoyment of life, all constituting non-economic loss in an amount to be determined at trial.

124. HubSpot's conduct was undertaken with malice or with reckless indifference to Dr. Boykin's federally protected rights, entitling her to punitive damages.

WHEREFORE, Dr. Boykin prays for judgment against HubSpot on this cause of action for back pay and front pay and lost benefits, compensatory damages for emotional distress, punitive damages, reasonable attorneys' fees and costs, pre- and post-judgment interest, injunctive and equitable relief, and such other relief as the Court deems just and equitable.

## SEVENTH CAUSE OF ACTION:

### Failure to Accommodate Disability in Violation of the Americans with Disabilities Act, 42 U.S.C. § 12101 et seq.

125. Dr. Boykin realleges and incorporates by reference all preceding paragraphs of this Complaint as if fully set forth herein.

126. The ADA requires an employer to provide reasonable accommodations to the known physical limitations of a qualified individual with a disability unless doing so would impose an undue hardship. To establish this claim, Dr. Boykin must show that she had a disability of which HubSpot knew, that she was a qualified individual, that she requested or needed a reasonable accommodation, and that HubSpot failed to provide it.

127. Dr. Boykin had a disability of which HubSpot was aware, as reflected in her FMLA certification completed by pain management specialist Katharine Wilson, FNP-C, and the medical documentation HubSpot possessed reflecting her conditions, incapacity, and recovery timeline.

128. Dr. Boykin was a qualified individual who could perform the essential functions of her position with reasonable accommodation, including approved medical leave for treatment and recovery from her procedures.

129. Dr. Boykin requested and was entitled to the reasonable accommodation of continued medical leave to recover from her scheduled Anterior Lumbar Interbody Fusion surgery, with an expected incapacity period extending to June 30, 2025.

130. Rather than provide the reasonable accommodation of leave through her recovery period, HubSpot terminated Dr. Boykin's employment effective June 2, 2025, the day of her surgery, and simultaneously terminated her benefits. HubSpot cannot demonstrate that the accommodation would have imposed an undue hardship.

131. As a direct and proximate result of HubSpot's unlawful conduct, Dr. Boykin has incurred and continues to incur economic losses in an amount to be proven at trial.

132. As a direct and proximate result of HubSpot's unlawful conduct, Dr. Boykin has suffered and will continue to suffer mental stress, humiliation, inconvenience, and loss of enjoyment of life, all constituting non-economic loss in an amount to be determined at trial.

133. HubSpot's conduct was undertaken with malice or with reckless indifference to Dr. Boykin's federally protected rights, entitling her to punitive damages.

WHEREFORE, Dr. Boykin prays for judgment against HubSpot on this cause of action for back pay and front pay and lost benefits, compensatory damages for emotional distress, punitive damages, reasonable attorneys' fees and costs, pre- and post-judgment interest, injunctive and equitable relief, and such other relief as the Court deems just and equitable.

## EIGHTH CAUSE OF ACTION:

### Failure to Engage in the Interactive Process in Violation of the Americans with Disabilities Act, 42 U.S.C. § 12101 et seq.

134. Dr. Boykin realleges and incorporates by reference all preceding paragraphs of this Complaint as if fully set forth herein.

135. The ADA requires an employer, once on notice of an employee's disability and need for accommodation, to engage in a good-faith interactive process to identify a reasonable accommodation. To establish this claim, Dr. Boykin must show that she had a disability of which HubSpot was aware, that she requested accommodation or that the need for accommodation was otherwise apparent, that HubSpot failed to engage in a good-faith interactive process, and that a reasonable accommodation was available.

136. Dr. Boykin had a disability of which HubSpot was aware through her FMLA certification and supporting medical documentation.

137. The need for accommodation was apparent to HubSpot, which possessed Dr. Boykin's medical documentation reflecting her incapacity and expected recovery period following her scheduled surgery.

138. HubSpot failed to engage in any good-faith interactive process to identify a reasonable accommodation. Instead of communicating with Dr. Boykin about her medical needs and recovery, HubSpot terminated her employment on the day of her surgery.

139. A reasonable accommodation, including continued leave through her recovery period, was available and would not have imposed an undue hardship.

140. As a direct and proximate result of HubSpot's unlawful conduct, Dr. Boykin has incurred and continues to incur economic losses in an amount to be proven at trial.

141. As a direct and proximate result of HubSpot's unlawful conduct, Dr. Boykin has suffered and will continue to suffer mental stress, humiliation, inconvenience, and loss of enjoyment of life, all constituting non-economic loss in an amount to be determined at trial.

142. HubSpot's conduct was undertaken with malice or with reckless indifference to Dr. Boykin's federally protected rights, entitling her to punitive damages.

WHEREFORE, Dr. Boykin prays for judgment against HubSpot on this cause of action for back pay and front pay and lost benefits, compensatory damages for emotional distress, punitive damages, reasonable attorneys' fees and costs, pre- and post-judgment interest, injunctive and equitable relief, and such other relief as the Court deems just and equitable.

**NINTH CAUSE OF ACTION:**

**Retaliation in Violation of the Americans with Disabilities Act, 42 U.S.C. § 12203**

143. Dr. Boykin realleges and incorporates by reference all preceding paragraphs of this Complaint as if fully set forth herein.

144. The ADA prohibits an employer from retaliating against an individual because she has opposed an act or practice made unlawful by the ADA or because she has requested a reasonable accommodation. To establish this claim, Dr. Boykin must show that she engaged in protected activity, that she suffered a materially adverse action, and that a causal connection exists between the two.

145. Dr. Boykin engaged in protected activity under the ADA by disclosing her disability, submitting medical documentation and an FMLA certification, and requesting and taking medical leave as an accommodation for her disability.

146. Dr. Boykin suffered a materially adverse action when HubSpot terminated her employment effective June 2, 2025, the day of her scheduled surgery, and terminated her benefits.

147. A causal connection exists between Dr. Boykin's protected activity and her termination, as demonstrated by the close temporal proximity between her disability-related leave and medical documentation and the timing of her termination on the exact date of her surgery, while HubSpot possessed her recovery timeline.

148. As a direct and proximate result of HubSpot's unlawful conduct, Dr. Boykin has incurred and continues to incur economic losses in an amount to be proven at trial.

149. As a direct and proximate result of HubSpot's unlawful conduct, Dr. Boykin has suffered and will continue to suffer mental stress, humiliation, inconvenience, and loss of enjoyment of life, all constituting non-economic loss in an amount to be determined at trial.

150. HubSpot's conduct was undertaken with malice or with reckless indifference to Dr. Boykin's federally protected rights, entitling her to punitive damages.

WHEREFORE, Dr. Boykin prays for judgment against HubSpot on this cause of action for back pay and front pay and lost benefits, compensatory damages for emotional distress, punitive damages, reasonable attorneys' fees and costs, pre- and post-judgment interest, injunctive and equitable relief, and such other relief as the Court deems just and equitable.

**TENTH CAUSE OF ACTION:**

**Interference in Violation of the Family and Medical Leave Act, 29 U.S.C. §§ 2615(a)(1), 2617**

151. Dr. Boykin realleges and incorporates by reference all preceding paragraphs of this Complaint as if fully set forth herein.

152. The FMLA makes it unlawful for an employer to interfere with, restrain, or deny the exercise of or the attempt to exercise any right provided under the Act. To establish this claim, Dr. Boykin must show that she was an eligible employee, that HubSpot was a covered employer, that she was entitled to FMLA leave, that she gave adequate notice of her intent to take leave, and that HubSpot denied or interfered with an FMLA benefit to which she was entitled.

153. Dr. Boykin was an eligible employee under 29 U.S.C. § 2611(2), having been employed by HubSpot for more than twelve months and having worked more than 1,250 hours during the twelve-month period preceding her leave. HubSpot was a covered employer under 29 U.S.C. § 2611(4), employing fifty or more employees for each working day during twenty or more calendar workweeks. HubSpot employed fifty or more employees within seventy-five miles of the worksite to which Dr. Boykin reported.

154. Dr. Boykin was entitled to take FMLA leave for her own serious health condition, including her spinal conditions and the surgeries and procedures required to treat them, and gave

HubSpot adequate notice of her need for leave through her FMLA certification and supporting documentation.

155. HubSpot interfered with Dr. Boykin's exercise of her FMLA rights by terminating her employment effective June 2, 2025, while she was on approved, paid FMLA leave and on the exact date of her scheduled surgery, thereby denying her the continued leave, reinstatement, and benefits to which she was entitled under the FMLA.

156. As a direct and proximate result of HubSpot's unlawful conduct, Dr. Boykin has incurred and continues to incur economic losses, including lost wages, salary, benefits, and other compensation, in an amount to be proven at trial. HubSpot's violation was not in good faith, entitling Dr. Boykin to liquidated damages.

WHEREFORE, Dr. Boykin prays for judgment against HubSpot on this cause of action for lost wages, salary, benefits, and other compensation, liquidated damages, equitable relief including reinstatement or front pay, reasonable attorneys' fees and costs, pre- and post-judgment interest, and such other relief as the Court deems just and equitable.

**ELEVENTH CAUSE OF ACTION:**

**Retaliation in Violation of the Family and Medical Leave Act, 29 U.S.C. §§ 2615(a)(1), (a)(2), 2617**

157. Dr. Boykin realleges and incorporates by reference all preceding paragraphs of this Complaint as if fully set forth herein.

158. The FMLA prohibits an employer from discharging or in any other manner discriminating against an employee for exercising or attempting to exercise rights protected under the Act. To establish this claim, Dr. Boykin must show that she engaged in protected activity under the FMLA, that she suffered a materially adverse action, and that a causal connection exists between the protected activity and the adverse action.

159. Dr. Boykin engaged in activity protected under the FMLA by taking and continuing to take approved FMLA leave for her serious health condition.

160. HubSpot took a materially adverse action against Dr. Boykin by terminating her employment effective June 2, 2025.

161. A causal connection exists between Dr. Boykin's protected FMLA activity and her termination, as demonstrated by the fact that HubSpot terminated her while she was on approved FMLA leave, on the exact date of her scheduled surgery, and with knowledge of her FMLA-protected recovery timeline.

162. As a direct and proximate result of HubSpot's unlawful conduct, Dr. Boykin has incurred and continues to incur economic losses, including lost wages, salary, benefits, and other compensation, in an amount to be proven at trial. HubSpot's violation was not in good faith, entitling Dr. Boykin to liquidated damages.

WHEREFORE, Dr. Boykin prays for judgment against HubSpot on this cause of action for lost wages, salary, benefits, and other compensation, liquidated damages, equitable relief including reinstatement or front pay, reasonable attorneys' fees and costs, pre- and post-judgment interest, and such other relief as the Court deems just and equitable.

## TWELFTH CAUSE OF ACTION:

### Race Discrimination - Disparate Treatment in Violation of the Massachusetts Fair Employment Practices Act, G.L. c. 151B, § 4(1)

163. Dr. Boykin realleges and incorporates by reference all preceding paragraphs of this Complaint as if fully set forth herein.

164. Section 4(1) of G.L. c. 151B makes it unlawful for an employer to discriminate against an individual in compensation or in the terms, conditions, or privileges of employment because of the individual's race or color. To establish this claim, Dr. Boykin must show that she

is a member of a protected class, that she was performing her job at an acceptable level, that she suffered an adverse employment action, and that the action occurred in circumstances giving rise to an inference of race discrimination.

165. Dr. Boykin is a Black woman and a member of a protected class under G.L. c. 151B.

166. Dr. Boykin was performing her job at an acceptable level, as reflected by her performance ratings, measurable program outcomes, and three successive promotions or internal advances.

167. Dr. Boykin suffered adverse employment actions, including the denial of promotions and transfers, the simultaneous rejection of five internal job applications, and the termination of her employment.

168. These actions occurred in circumstances giving rise to an inference of race discrimination, including the more favorable treatment of white colleagues who were placed into leadership and transfer roles without competition, the selection of a less-qualified white colleague over Dr. Boykin, and the retention of non-Black program managers when Dr. Boykin was terminated. HubSpot’s stated reasons were pretextual.

169. As a direct and proximate result of HubSpot’s unlawful conduct, Dr. Boykin has incurred and continues to incur economic losses in an amount to be proven at trial, and has suffered and will continue to suffer mental stress, humiliation, inconvenience, and loss of enjoyment of life, all constituting non-economic loss in an amount to be determined at trial. HubSpot’s conduct was outrageous or done with reckless indifference to Dr. Boykin’s rights, entitling her to punitive damages.

WHEREFORE, Dr. Boykin prays for judgment against HubSpot on this cause of action for back pay and front pay and lost benefits, compensatory damages for emotional distress, punitive damages, reasonable attorneys' fees and costs, pre- and post-judgment interest, injunctive and equitable relief, and such other relief as the Court deems just and equitable.

**THIRTEENTH CAUSE OF ACTION:**

**Race-Based Hostile Work Environment in Violation of the Massachusetts Fair Employment Practices Act, G.L. c. 151B, § 4(1)**

170. Dr. Boykin realleges and incorporates by reference all preceding paragraphs of this Complaint as if fully set forth herein.

171. Section 4(1) of G.L. c. 151B prohibits an employer from subjecting an employee to a hostile work environment because of the employee's race or color. To establish this claim, Dr. Boykin must show that she was subjected to conduct because of her race that was sufficiently severe or pervasive to alter the conditions of her employment and create an abusive working environment, and that a basis exists for employer liability.

172. Dr. Boykin, a Black woman, was subjected to conduct because of her race, including the persistent undermining of her professional authority, the minimization of her documented outcomes, the assignment of a disproportionate workload and denial of Project Manager support extended to white colleagues, demeaning multi-person feedback sessions, and the suggestion that she was "just not good at her job."

173. This conduct was severe or pervasive, persisted throughout her tenure, escalated after she reported racial disparities, and created a work environment that a reasonable person would find, and that Dr. Boykin did find, hostile and abusive.

174. A basis exists for imputing liability to HubSpot because the conduct was committed by Dr. Boykin's supervisors and managers, and because HubSpot failed to take effective remedial action despite her complaints.

175. As a direct and proximate result of HubSpot's unlawful conduct, Dr. Boykin has incurred and continues to incur economic losses in an amount to be proven at trial, and has suffered and will continue to suffer mental stress, humiliation, inconvenience, and loss of enjoyment of life, all constituting non-economic loss in an amount to be determined at trial. HubSpot's conduct was outrageous or done with reckless indifference to Dr. Boykin's rights, entitling her to punitive damages.

WHEREFORE, Dr. Boykin prays for judgment against HubSpot on this cause of action for back pay and front pay and lost benefits, compensatory damages for emotional distress, punitive damages, reasonable attorneys' fees and costs, pre- and post-judgment interest, injunctive and equitable relief, and such other relief as the Court deems just and equitable.

**FOURTEENTH CAUSE OF ACTION:**

**Retaliation for Protected Activity in Violation of the Massachusetts Fair Employment Practices Act, G.L. c. 151B, § 4(4)**

176. Dr. Boykin realleges and incorporates by reference all preceding paragraphs of this Complaint as if fully set forth herein.

177. Section 4(4) of G.L. c. 151B makes it unlawful for an employer to discharge, expel, or otherwise discriminate against any person because that person has opposed practices forbidden under the statute or has filed a complaint, testified, or assisted in a proceeding. To establish this claim, Dr. Boykin must show that she engaged in protected activity, that she suffered an adverse action, and that a causal connection exists between the two.

178. Dr. Boykin engaged in protected activity by reporting concerns about racially disparate promotion and separation practices to HubSpot management and human resources, by participating in the company's fact-finding panel, and by filing formal complaints and requests to reopen the retaliation investigation.

179. Dr. Boykin suffered adverse actions, including heightened bad-faith scrutiny, a retaliatory counter-investigation, the denial of five internal job applications rejected on the same day, and the termination of her employment.

180. A causal connection exists between Dr. Boykin's protected activity and the adverse actions, as demonstrated by the close temporal proximity between her complaints and the adverse actions and by Al Smith's confirmation that Annie Ingram "was pissed" Dr. Boykin had opened an HR case against her.

181. As a direct and proximate result of HubSpot's unlawful conduct, Dr. Boykin has incurred and continues to incur economic losses in an amount to be proven at trial, and has suffered and will continue to suffer mental stress, humiliation, inconvenience, and loss of enjoyment of life, all constituting non-economic loss in an amount to be determined at trial. HubSpot's conduct was outrageous or done with reckless indifference to Dr. Boykin's rights, entitling her to punitive damages.

WHEREFORE, Dr. Boykin prays for judgment against HubSpot on this cause of action for back pay and front pay and lost benefits, compensatory damages for emotional distress, punitive damages, reasonable attorneys' fees and costs, pre- and post-judgment interest, injunctive and equitable relief, and such other relief as the Court deems just and equitable.

///

///

## FIFTEENTH CAUSE OF ACTION:

## Age Discrimination in Violation of the Massachusetts Fair Employment Practices Act, G.L. c. 151B, § 4(1B)

182. Dr. Boykin realleges and incorporates by reference all preceding paragraphs of this Complaint as if fully set forth herein.

183. Section 4(1B) of G.L. c. 151B makes it unlawful for an employer to discriminate against an individual who is 40 years of age or older in compensation or in the terms, conditions, or privileges of employment because of the individual's age. To establish this claim, Dr. Boykin must show that she was 40 years of age or older, that she was performing her job at an acceptable level, that she suffered an adverse employment action, and that age was a determinative factor in the action.

184. At all relevant times, Dr. Boykin was over the age of 40 and within the class protected by G.L. c. 151B, § 4(1B).

185. Dr. Boykin was performing her job at an acceptable level.

186. Dr. Boykin suffered adverse employment actions, including the denial of promotions and transfers, the simultaneous rejection of five internal job applications, and the termination of her employment.

187. Substantially younger employees were treated more favorably, including being placed into leadership and transfer roles without competition and being retained when Dr. Boykin was terminated. Age was a determinative factor in the adverse actions taken against Dr. Boykin.

188. As a direct and proximate result of HubSpot's unlawful conduct, Dr. Boykin has incurred and continues to incur economic losses in an amount to be proven at trial, and has suffered and will continue to suffer mental stress, humiliation, inconvenience, and loss of

enjoyment of life, all constituting non-economic loss in an amount to be determined at trial. HubSpot's conduct was outrageous or done with reckless indifference to Dr. Boykin's rights, entitling her to punitive damages.

WHEREFORE, Dr. Boykin prays for judgment against HubSpot on this cause of action for back pay and front pay and lost benefits, compensatory damages for emotional distress, punitive damages, reasonable attorneys' fees and costs, pre- and post-judgment interest, injunctive and equitable relief, and such other relief as the Court deems just and equitable.

## SIXTEENTH CAUSE OF ACTION:

### Disability Discrimination - Disparate Treatment in Violation of the Massachusetts Fair Employment Practices Act, G.L. c. 151B, § 4(16)

189. Dr. Boykin realleges and incorporates by reference all preceding paragraphs of this Complaint as if fully set forth herein.

190. Section 4(16) of G.L. c. 151B makes it unlawful for an employer to dismiss from employment or otherwise discriminate against a qualified handicapped person who is capable of performing the essential functions of the position with or without reasonable accommodation, because of the person's handicap. To establish this claim, Dr. Boykin must show that she is handicapped within the meaning of the statute, that she is a qualified handicapped person capable of performing the essential functions of the job with or without reasonable accommodation, and that she suffered an adverse employment action because of her handicap.

191. Dr. Boykin is a handicapped person within the meaning of G.L. c. 151B. She suffers from lumbar spondylosis and related spinal conditions, including cervical spondylosis, sacroiliitis, bilateral lumbar radiculopathy, and complex regional pain syndrome, which substantially limit major life activities. In the alternative, HubSpot regarded her as handicapped.

192. Dr. Boykin was a qualified handicapped person capable of performing the essential functions of her position with or without reasonable accommodation.

193. HubSpot discriminated against Dr. Boykin because of her handicap by terminating her employment effective June 2, 2025, the exact date of her scheduled major back surgery, while she was on approved leave and while HubSpot possessed her medical documentation.

194. As a direct and proximate result of HubSpot's unlawful conduct, Dr. Boykin has incurred and continues to incur economic losses in an amount to be proven at trial, and has suffered and will continue to suffer mental stress, humiliation, inconvenience, and loss of enjoyment of life, all constituting non-economic loss in an amount to be determined at trial. HubSpot's conduct was outrageous or done with reckless indifference to Dr. Boykin's rights, entitling her to punitive damages.

WHEREFORE, Dr. Boykin prays for judgment against HubSpot on this cause of action for back pay and front pay and lost benefits, compensatory damages for emotional distress, punitive damages, reasonable attorneys' fees and costs, pre- and post-judgment interest, injunctive and equitable relief, and such other relief as the Court deems just and equitable.

**SEVENTEENTH CAUSE OF ACTION:**

**Failure to Accommodate Disability in Violation of the Massachusetts Fair Employment Practices Act, G.L. c. 151B, § 4(16)**

195. Dr. Boykin realleges and incorporates by reference all preceding paragraphs of this Complaint as if fully set forth herein.

196. Section 4(16) of G.L. c. 151B requires an employer to make reasonable accommodation to the known handicap of a qualified handicapped employee unless the employer can demonstrate that the accommodation would impose an undue hardship. To establish this

claim, Dr. Boykin must show that she is a qualified handicapped person, that HubSpot was aware of her handicap, that she needed a reasonable accommodation to perform the essential functions of her job, and that HubSpot failed to provide it.

197. Dr. Boykin was a qualified handicapped person, and HubSpot was aware of her handicap through her FMLA certification and supporting medical documentation.

198. Dr. Boykin needed and was entitled to the reasonable accommodation of continued medical leave to recover from her scheduled Anterior Lumbar Interbody Fusion surgery, with an expected incapacity period extending to June 30, 2025.

199. HubSpot failed to provide this reasonable accommodation and instead terminated Dr. Boykin's employment on the day of her surgery and terminated her benefits. HubSpot cannot demonstrate that the accommodation would have imposed an undue hardship.

200. As a direct and proximate result of HubSpot's unlawful conduct, Dr. Boykin has incurred and continues to incur economic losses in an amount to be proven at trial, and has suffered and will continue to suffer mental stress, humiliation, inconvenience, and loss of enjoyment of life, all constituting non-economic loss in an amount to be determined at trial. HubSpot's conduct was outrageous or done with reckless indifference to Dr. Boykin's rights, entitling her to punitive damages.

WHEREFORE, Dr. Boykin prays for judgment against HubSpot on this cause of action for back pay and front pay and lost benefits, compensatory damages for emotional distress, punitive damages, reasonable attorneys' fees and costs, pre- and post-judgment interest, injunctive and equitable relief, and such other relief as the Court deems just and equitable.

///

///

## EIGHTEENTH CAUSE OF ACTION:

### Disability Retaliation in Violation of the Massachusetts Fair Employment Practices Act, G.L. c. 151B, § 4(4) and § 4(4A)

201. Dr. Boykin realleges and incorporates by reference all preceding paragraphs of this Complaint as if fully set forth herein.

202. Sections 4(4) and 4(4A) of G.L. c. 151B make it unlawful for an employer to retaliate against, coerce, intimidate, threaten, or interfere with an individual who has opposed practices forbidden under the statute or who has exercised or enjoyed rights granted or protected by the statute, including the right to reasonable accommodation of a handicap. To establish this claim, Dr. Boykin must show that she engaged in protected activity, that she suffered an adverse action, and that a causal connection exists between the two.

203. Dr. Boykin engaged in protected activity by disclosing her handicap, submitting medical documentation, and requesting and taking medical leave as an accommodation.

204. HubSpot took adverse action against Dr. Boykin by terminating her employment effective June 2, 2025, the day of her scheduled surgery, and terminating her benefits.

205. A causal connection exists between Dr. Boykin's protected activity and her termination, as demonstrated by the close temporal proximity between her accommodation-related leave and medical documentation and the timing of her termination on the exact date of her surgery.

206. As a direct and proximate result of HubSpot's unlawful conduct, Dr. Boykin has incurred and continues to incur economic losses in an amount to be proven at trial, and has suffered and will continue to suffer mental stress, humiliation, inconvenience, and loss of enjoyment of life, all constituting non-economic loss in an amount to be determined at trial.

HubSpot's conduct was outrageous or done with reckless indifference to Dr. Boykin's rights, entitling her to punitive damages.

WHEREFORE, Dr. Boykin prays for judgment against HubSpot on this cause of action for back pay and front pay and lost benefits, compensatory damages for emotional distress, punitive damages, reasonable attorneys' fees and costs, pre- and post-judgment interest, injunctive and equitable relief, and such other relief as the Court deems just and equitable.

## ATTORNEY FEES AND COSTS; PREJUDGMENT INTEREST

207. Dr. Boykin realleges and incorporates by reference all preceding paragraphs of this Complaint as if fully set forth herein.

208. As the direct result of HubSpot's actions and omissions, Dr. Boykin has been required to bring this action.

209. Pursuant to Federal Rule of Civil Procedure 54(d)(2) and the fee-shifting provisions of Title VII, 42 U.S.C. § 2000e-5(k); the ADEA, 29 U.S.C. § 626(b); the ADA, 42 U.S.C. § 12205; the FMLA, 29 U.S.C. § 2617(a)(3); 42 U.S.C. § 1988(b) as to her claim under 42 U.S.C. § 1981; and G.L. c. 151B, § 9, Dr. Boykin is entitled to recover attorneys' fees and costs incurred herein.

210. Dr. Boykin is also entitled to prejudgment interest as provided by applicable law.

## VIII. DEMAND FOR JURY TRIAL

211. Dr. Boykin demands a trial by jury on all issues so triable, pursuant to Federal Rule of Civil Procedure 38.

## IX. PRAYER FOR RELIEF

WHEREFORE, Dr. Boykin prays for entry of judgment as follows:

A. Damages for back pay and benefits lost and for future pay and benefits lost;

B. Actual and compensatory damages;

C. Statutory damages;

D. Liquidated damages;

E. Non-economic damages for emotional distress, pain, suffering, and humiliation;

F. Punitive damages;

G. Pre- and post-judgment interest in an amount to be proven after trial;

H. Reasonable attorneys' fees and costs;

I. Injunctive and equitable relief, including reinstatement or front pay; and

J. Such other and further relief as the Court deems just and equitable.

DATED: August 21, 2026.

**HKM EMPLOYMENT ATTORNEYS LLP**

By: *<u>/s/ Brian Benestad</u>*
Brian Benestad, BBO No. 673787
Email: bbenestad@hkm.com
10 High Street, Suite 401
Boston, MA 02110
Telephone: 412-485-0133

*Attorney for Plaintiff Dr. Vrnda Boykin*